UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHAWN THOMAS KALETA, an
individual, and BEACH TO BAY
CONSTRUCTION LLC, a Florida limited
liability company,

    Plaintiffs,

v.                                      Case No. 8:16-cv-347-T-27AAS

CITY OF ANNA MARIA,

    Defendant.
_____/

## ORDER

**BEFORE THE COURT** are Defendant's Motion for Summary Judgment (Dkt. 73) and Plaintiffs' response in opposition (Dkt. 90).[1] Plaintiffs' response also includes an embedded motion to strike the affidavits of Pamela Gibbs and George McKay (Dkt. 90), which Defendant opposes (Dkt. 94). Upon consideration, Defendant's motion for summary judgment is **DENIED**, and Plaintiffs' embedded motion to strike is **DENIED**.

### I. BACKGROUND[2]

Shawn Kaleta is a licensed general contractor and owner Beach to Bay Construction, LLC. (Kaleta deposition, Dkt. 74-3 at 4:17-20, 13:5-10). Plaintiffs do business in the City of Anna Maria. (*Id.* at 16:5-9). Plaintiffs claim, under 42 U.S.C. § 1983, that the City violated their rights under the

---

[1] Also pending are Defendant's *Daubert* motion and several motions to strike the parties' respective experts and their reports. (Dkts. 65, 77, 86). However, the subject of those experts' opinions is damages, which is not material to the issues presented by Defendant's motion for summary judgment.

[2] A summary of the factual background of this case, including citations to the record, is attached to this Order as an Appendix.

Equal Protection Clause by subjecting their construction project at Magnolia Avenue to different requirements than similarly situated properties, intentionally and arbitrarily treating them differently than similarly situated builders with respect to their property at 9802 Gulf Drive, banning them from construction projects in the City, and filing a DBPR complaint against them. (Amended Complaint, Dkt. 23, Count I). Plaintiffs also claim that the City's actions are retaliation against their exercise of their First Amendment rights. (*Id.*, Count II).

## II. STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.' " *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). All facts are viewed and all reasonable inferences are drawn in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the initial burden of showing that there are no genuine disputes of material fact. *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, and admissions on file to designate facts showing a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. The nonmoving party's evidence "cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*,

2

932 F.2d 1572, 1577 (11th Cir. 1991). The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *See id.*

## III. DISCUSSION

When all facts are viewed and all reasonable inferences drawn in Plaintiffs' favor, the City fails to establish that there is no genuine dispute of material fact as to either count of the Amended Complaint. Plaintiffs' request to strike certain affidavits relied upon by the City in support of its motion for summary judgment shall be addressed first, because it impacts the evidence that may be considered in resolving the City's motion.

### A. *Plaintiffs Fail to Establish Grounds for Striking the Affidavits of Pamela Gibbs and George McKay*

Motions should not be embedded in responses to other motions. *See* FED. R. CIV. P. 7(b)(1); Local Rule 3.01(a). Plaintiffs also failed to comply with Local Rule 3.01(g). Notwithstanding those issues, which are sufficient to deny the motion, Plaintiffs do not establish a legal basis for striking the affidavits. They generally argue, under Federal Rule of Civil Procedure 56(c)(4), the affidavits should be stricken because they are based on inadmissible hearsay. (Response, Dkt. 90 at p. 4). However, they do not cite any rules of evidence. (*Id.*). And Gibbs and McKay's affidavits show that the pertinent averments are based on personal knowledge. (July 7, 2017 Affidavit of Gibbs, Dkt. 75-1) (averring based on personal knowledge that "[f]rom the beginning of 2010 to the present, the City

3

has neither denied Plaintiffs any Permits nor rejected any of Plaintiffs Permit applications");[3] (July 10, 2017 Affidavit of Gibbs, Dkt. 75-2) (averments based on her personal knowledge about the City's only subdivision); (Affidavit of McKay, Dkt. 75-3) (averring based on his personal knowledge that the City required Plaintiffs to fence in their construction on Magnolia Avenue to separate the construction from a pedestrian sidewalk).

### B. There is a Genuine Dispute of Material Fact Whether the City Intentionally Treated Plaintiffs and Their Properties Differently Than Similarly Situated Builders and Properties With No Rational Basis

Plaintiffs assert an Equal Protection Clause claim under a "class of one" theory, which "involves a plaintiff who 'alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1202 (11th Cir. 2007) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). "[T]he 'similarly situated' requirement must be rigorously applied in the context of 'class of one' claims." *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009). "Too broad a definition of 'similarly situated' could subject nearly all state regulatory decisions to constitutional review in federal court and deny state regulators the critical discretion they need to effectively perform their duties." *Griffin Indus.*, 496 F.3d at 1203. "Conversely, too narrow a definition of 'similarly situated' could exclude from the zone of equal protection those who are plainly treated disparately and without a rational basis." *Id.*

"Class of one" plaintiffs must demonstrate that comparators are *prima facie* identical in all relevant respects. *Id.* at 1204. "[W]here the challenged governmental decision is simple or

---

[3] To the extent Gibbs' averments are based on official records of the City, the City sufficiently explains that the information can be submitted in an admissible form at trial and, therefore, her averments may be considered for summary judgment purposes. *See* (Response to Motion to Strike, Dkt. 94) (citing FED. R. CIV. P. 56 advisory committee's notes).

one-dimensional—for example, where the decision involves the application of a single criterion to a single issue—making out a 'class of one claim' is generally easier than in cases where governmental action is 'multi-dimensional, involving varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time.' " *Leib*, 558 F.3d at 1307 (quoting *Griffin Indus.*, 496 F.3d at 1203). At bottom, "[e]qual protection of the laws in the 'class of one' context requires no more than that [plaintiffs] be 'secure[d] . . . against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " *Griffin Indus.*, 496 F.3d at 1208 (quoting *Olech*, 528 U.S. at 564).

### 1. *Plaintiffs' Evidence Shows A Genuine Question of Whether the City Subjected the Magnolia Avenue Properties to Different Construction Requirements Than Similarly Situated Properties*

Starting with the Magnolia Avenue properties, there is a genuine dispute of material fact of whether the Villa Rosa Way properties are similarly situated and whether the City treated the two properties differently, without a rational basis. The City's reasons for requiring a chain link fence at Magnolia but not at Villa Rosa had to do with greater traffic volume, which shifted the burden to Plaintiffs to present evidence that the properties are comparable. Plaintiffs' evidence shows that the City claimed that a fence was required at Magnolia because the project consisted of five or more lots, and that the City did not require a fence at the Villa Rosa project, consisting of more than five lots. All facts must be viewed and all reasonable inferences must be drawn in Plaintiffs' favor. *Scott*, 550 U.S. at 380. Accordingly, Plaintiffs establish a genuine question of whether the City intentionally and arbitrarily treated the Magnolia property differently than a similarly situated property when applying the one-dimensional criterion of requiring fences at developments consisting of five or

more properties. *See Leib*, 558 F.3d at 1307. Under that criterion, the Villa Rosa properties are comparable to the Magnolia properties in all relevant respects, and Plaintiffs' equal protection claim establishes a jury question. *Griffin Indus.*, 496 F.3d at 1205.[4]

### 2. *There is a Genuine Question of Whether the City Intentionally and Arbitrarily Treated 9802 Gulf Drive Differently Because Plaintiffs Owned that Property*

There is also a genuine dispute of material fact with regard to the City's treatment of Plaintiffs' 9802 Gulf Drive property. With all reasonable inferences drawn in Plaintiffs' favor, the evidence shows that the Mayor directed Building Official Jimmy Strickland to issue a red tag to 9802 Gulf Drive on July 31, 2015, even after Plaintiffs showed Strickland that there was no unpermitted work occurring at the property. The Mayor then directed Strickland to shut off the utilities at the property in September 2015. The Mayor has never ordered utilities to be shut off at the property of any other builder. Because of the problems, Kaleta told Strickland he planned to demolish the cottage on the property. Once the City Commission learned of Kaleta's plan, one commissioner proposed an ordinance designed to save the cottage. And in November 2015, the City Commission passed an ordinance requiring that no demolition permit shall be issued until approval of a building permit for the same lot or parcel. Therefore, once the City lifted the stop work order from 9802 Gulf Drive, Plaintiffs could not demolish the cottage on the property without complying with the new

---

[4] The City, however, establishes the absence of a genuine dispute of material fact to the extent Plaintiffs claim that it treated the Magnolia properties differently by charging them for the rear alley drainage system changes. Frank Agnelli testified that the City did not require him to redo rear alleys at his properties as part of its retrofit plan, but that "I have done . . . some work, but that was only because I may have caused some problems with it." (Agnelli deposition, Dkt. 74-1 at 64:1-5). He also testified that builders know that they must repair any damage caused to City property during construction and that the City will not issue a final certificate of occupancy until the builders pay for the repairs. (*Id.* at 24:21-27:11). Accordingly, the City has established the absence of evidence of an identical comparator that it treated differently, and Plaintiffs have not met their burden of identifying another property, identical in all relevant respects to its Magnolia properties, that the City treated differently with respect to the drainage system costs. *See Leib*, 558 F.3d at 1306-07 ("[T]he 'similarly situated' requirement must be rigorously applied in the context of 'class of one' claims.")

6

ordinance. A reasonable juror could find that the City intentionally treated 9802 Gulf Drive differently than properties owned by other builders, simply because it was owned by Plaintiffs.

There is also a genuine question of whether Frank Agnelli is a similarly situated builder in all relevant respects. He and his business engage in a similar volume of construction activities in the City as Plaintiffs, and their properties have received as many, if not more, red tags. The Mayor has never directed city employees to shut off the utilities at Agnelli's red tagged properties, even though he has received several red tags and the Mayor knows he is more prone to errors than Plaintiffs. Accordingly, the City has not established the absence of a genuine question of whether it had a rational basis for treating Plaintiffs' 9802 Gulf Drive differently than red tagged properties owned by similarly situated builders.

### 3. *There is No Evidence that the City Made a Final Decision to Ban Plaintiffs*

The City has shown the absence of a genuine question of whether it banned Plaintiffs from obtaining permits. Although Plaintiffs provide evidence that City employees stated that they could not accept permit applications or issue permits for a couple of months after the Mayor announced a ban, and that the City's Planning and Zoning Commission affirmed the denial of a permit in November 2015, the evidence shows that the City continued to grant permits to Plaintiffs even after the Mayor's statements. There is no evidence, therefore, that the City denied Plaintiffs a permit based on the Mayor's statements. City employees temporarily refusing to accept or issue permits was not a final decision that gives rise to an equal protection claim. *See Strickland v. Alderman*, 74 F.3d 260, 265-66 & n.7 (11th Cir. 1996) (holding that a plaintiff's equal protection claim was not ripe because the evidence showed only that city employees informed plaintiff and his prospective buyers that they would be unable to obtain permits).

7

### 4. *There is a Genuine Question of Whether the City's DBPR Complaint Against Plaintiffs Violated Their Equal Protection Rights*

The City has not filed a DBPR complaint against any builder other than Kaleta, and a complaint against Kaleta's license is effectively a complaint against Beach to Bay Construction because he is the general contractor and owner. The Mayor testified that the basis for the DBPR complaint against Plaintiffs was the three or four red tags issued to Plaintiffs' properties. Agnelli and his business are similarly situated to Plaintiffs with respect to the DBPR complaint, because the City has issued as many, if not more, red tags to their properties.[5] The evidence, therefore, demonstrates a genuine question of whether the City intentionally treated Plaintiffs differently than similarly situated builders, without a rational basis, in applying its one-dimensional criterion for a DBPR complaint. *See Leib*, 558 F3d at 1307.

### 5. *Plaintiffs' Equal Protection Claim is Ripe*

The City generally argues that Plaintiffs have not presented a ripe equal protection claim. (Motion for Summary Judgment, Dkt. 73 at pp. 12-13). The City relies on a case in which the Eleventh Circuit affirmed judgment as a matter of law against a plaintiff who failed to establish the ripeness of an equal protection claim based on denied permits. *Strickland v*, 74 F.3d at 266.[6] But the

---

[5] The City generally argues that Plaintiffs have no comparators "across the board" because the other builders in the City are not as large, they do not focus on the construction of vacation homes, and they do not own the properties on which they build. (Motion for Summary Judgment, Dkt. 73 at pp. 10–11). However, the City fails to establish that Agnelli is not comparable to Plaintiffs in all *relevant* respects. *See Griffin Indus.*, 496 F.3d at 1205. He has about as many projects in the City as Plaintiffs, if not more. The City has issued as many red tags to Agnelli's properties as it has to Plaintiffs' properties, if not more. The evidence, viewed in a light most favorable to Plaintiffs, shows that the grounds for the City's decisions to shut off utilities at 9802 Gulf Drive and to file a DBPR complaint against Plaintiffs were the stop work order and the number of red tags issued to Plaintiffs' properties, respectively. And it shows that the City applied these grounds differently to Plaintiffs than to Agnelli.

[6] The City cites another case for the proposition that Plaintiffs ignored its administrative remedies and prematurely filed federal constitutional claims. (Motion for Summary Judgment, Dkt. 73 at pp. 12-13) (citing *Boatman v. Town of Oakland, Fla.*, 76 F.3d 341, 346 (11th Cir. 1996)). That case is not applicable, however, because the subject matter jurisdiction question turned on whether the plaintiffs' claims raised a federal question, not whether their claims

8

denial of permits is only one of several bases Plaintiffs rely on to support their equal protection claim. And, as noted, they present a triable equal protection claim to the extent it is based on the City's decisions about the Magnolia Avenue development, the 9802 Gulf Drive property, and the DBPR complaint.

The evidence sufficiently shows the finality of each of those decisions. Kaleta testified that he negotiated with the City's Building Department about the fence around the Magnolia project, but it would not issue building permits until he installed the fence. Plaintiffs installed the fence, and the City issued the building permits. Strickland filed the DBPR complaint against Plaintiffs after the Mayor discussed doing so at a City Commission meeting. The Mayor directed a red tag and utility shutoff at 9802 Gulf Drive. And the facts viewed in Plaintiffs' favor show that the red tag was not lifted from 9802 Gulf Drive until after the City Commission passed an ordinance that prevented Plaintiffs from demolishing the cottage on the property without obtaining a new building permit. Those actions, therefore, are final for purposes of an equal protection claim. *See Olech*, 528 U.S. at 563 (holding that a plaintiff had a legally sufficient equal protection claim against a village even though the village reversed the challenged action within a few months).

### C. *There is a Genuine Question of Whether the City Retaliated Against Plaintiffs' Exercise of Their First Amendment Rights*

The City fails to establish the absence of a genuine dispute of material fact of whether it engaged in adverse actions against Plaintiffs because they exercised their First Amendment rights. A plaintiff asserting a First Amendment retaliation claim "must show that (1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of

---

were ripe. *See Boatman*, 76 F.3d at 345 ("[T]he Boatmans' claim turned solely on a question of state law: whether their structure was a 'mobile home,' as defined in the Town's zoning ordinance.").

ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). " '[T]he effect on freedom of speech may be small, . . . it need not be great in order to be actionable.' " *Bennett*, 423 F.3d at 1254 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). For example, "the retaliatory issuance of parking tickets totaling $35," *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir.2003), a campaign of petty harassments, including holding a plaintiff up to ridicule for bringing a birthday cake to the office, *Bart*, 677 F.2d at 624–25, and a civil malicious prosecution lawsuit brought by public officials, *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir.1983), are sufficient to meet the adverse conduct requirement. *Bennett*, 423 F.3d at 1255.

Plaintiffs engaged in activities that qualify for First Amendment protection. Specifically, their counsel's comments made on their behalf at a City Commission meeting. The City provides no legal basis for why those comments do not constitute protected speech. And Plaintiffs filed lawsuits against the City in 2013 based on violations of rights afforded by Florida law. Those lawsuits are a protected form of petitioning the government for a redress of grievances under the First Amendment. *See Bennett*, 423 F.3d at 1254 (citing *Cate*, 707 F.2d at 1190); *see also Tuccio v. Marconi*, 589 F.3d 538, 541 (2d Cir. 2009) ("To be sure, our constitutional doctrine prohibits government officials from punitive retaliation against persons who exercise their First Amendment right to sue the government.").

The evidence, viewed in Plaintiffs' favor, shows adverse conduct. The City imposed arbitrary construction requirements at their Magnolia Avenue properties, demanded that they pay for changes to the City drainage system around Magnolia Avenue, authorized the City attorney to take legal

action against them to recover the costs of those changes, issued red tags to several of their properties, shut off utilities at 9802 Gulf Drive, filed a DBPR complaint against them, and passed ordinances negatively affecting their property. There is also evidence of a campaign of petty harassments by city officials, including the Mayor publicly stating that Kaleta needed to clean up his act and Commissioner Nancy Yetter causing a former city commissioner to make a complaint against Kaleta to the DCF hotline for alleged mistreatment of children.[7] That adverse conduct is likely to deter a person of ordinary firmness from exercising their First Amendment rights. *Castle*, 631 F.3d at 1197 (citing *Bennett*, 423 F.3d at 1250).

With all reasonable inferences drawn in Plaintiffs' favor, the City has failed to establish the absence of a genuine question of whether there is a causal link between their exercise of First Amendment rights and its adverse conduct. Plaintiffs sued the City to enforce their rights under Florida law in 2013. The challenged actions occurred in 2014 and 2015. The City relies on Kaleta's testimony that he is not sure whether there is a direct connection between the lawsuit against the City and some of its adverse actions, but he did not conclusively say that he believed there was no connection. (Kaleta deposition, Dkt. 74-3 at 70:22-74:18). Based on the extent and the severity of adverse conduct engaged in by the City against Plaintiffs, ranging from passing ordinances affecting their property to causing someone to file a DCF complaint against Kaleta, there is a genuine question of whether "they would have undertaken their allegedly retaliatory actions even absent the plaintiffs' speech." *Bennett*, 423 F.3d at 1250 n.3.

---

[7] That the sitting commissioner was not the person who made the DCF complaint is of no moment. Christine Tollette testified that Yetter "knew I was the victim of child abuse." (Tollette deposition, Dkt. 90-11 at 23:1-2). Accordingly, with all reasonable inferences drawn in Plaintiffs' favor, Yetter knew that telling Tollette that she and Commissioner Carol Carter observed Kaleta "walk into the polling place and leave a child or two children alone in the car" would cause Tollette to make a DCF complaint against Kaleta. (*Id.* at 21:3-6).

### D. *The City Fails to Show the Absence of A Genuine Question of Whether The Challenged Actions Were Officially Sanctioned or Ordered by the City*

The City briefly argues in the alternative that even if there is evidence showing violations of Plaintiffs' constitutional rights, it is entitled to summary judgment on their section 1983 claims because the undisputed material facts show those violations did not result from a policy or custom.

"It is well established that a municipality may be held liable under § 1983 only when the deprivation at issue was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of *respondeat superior*." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991). "Thus, 'recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.' " *Id.* (quoting *Pembaur. Cincinnati*, 475 U.S. 469, 480 (1986)). "[A] municipal official who has 'final policymaking authority' in a certain area of the city's business may by his or her action subject the government to § 1983 liability when the challenged action falls within that authority." *Id.*

The City fails to meet its burden of showing the absence of a genuine question of whether the actions challenged by Plaintiffs were officially sanctioned by the City. There is evidence that City employees acted at the Mayor and the city commissioners' direction when they required Plaintiffs to install a fence around the Magnolia Avenue construction. There is also evidence that the Mayor personally directed city employees to issue a red tag and shut off the utilities at 9802 Gulf Drive. The City Commission then enacted an ordinance designed to inhibit Plaintiffs from demolishing the cottage on that property after the red tag was lifted. And either the Mayor or Strickland made the decision to file a DBPR complaint against Plaintiffs, only days after the Mayor stated at a commission meeting that the City was documenting their violations with the DBPR.

12

With all reasonable inferences drawn in Plaintiffs' favor, there is sufficient evidence for a reasonable juror to find that the City officially sanctioned the challenged actions of its officials and employees. Even if those officials did not actually have that authority, there is sufficient evidence to create a genuine question of whether their decisions, as a practical matter, were final. *See Willingham v. City of Valparaiso Fla.*, 638 F. App'x 903, 907 (11th Cir. 2016) (affirming the district court's denial of a city's summary judgment motion where "the evidence overwhelmingly showed that Mayor Arnold's decision to terminate Willingham was not subject to any meaningful administrative review."); *see also Brown*, 923 F.2d at 1480 ("Our task, however, is not to determine who, in fact, wields final policymaking authority[.]").

## IV. CONCLUSION

Defendant's Motion for Summary Judgment (Dkt. 73) is **DENIED**. Plaintiffs' embedded motion to strike the affidavits of Pamela Gibbs and George McKay (Dkt. 90) is **DENIED**.

**DONE AND ORDERED** this 3rd day of October, 2017.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of record

13